# STATE OF MICHIGAN

# COURT OF APPEALS

---

DJB RENTALS, INC, and DAVID BROWN,
d/b/a GRAND RIVER AUTO and STAY DRY
BASEMENT WATER PROOFING, INC

        Plaintiffs/Counter Defendants-
        Appellants,

v

NAJIM ALMALIKY,

        Defendant/Counter Plaintiff-
        Appellee.

UNPUBLISHED
March 21, 2017

No. 329562 & 330768
Ingham Circuit Court
LC No. 14-000102-CB

---

Before: BECKERING, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM.

In these consolidated cases, in Docket No. 329562, plaintiffs appeal by right the trial court's September 15, 2015, order entered following a bench trial wherein the trial court found plaintiffs liable to defendant/counter-plaintiff Najim Almaliky (defendant) for misappropriation of funds and for payments associated with the termination of a business partnership. In Docket No. 330768, plaintiffs appeal by right a November 30, 2015, trial court order reducing the purchase price that defendant was ordered to reimburse plaintiffs for real estate jointly owned by defendant and plaintiff DJB Rentals, Inc. For the reasons set forth in this opinion, we affirm the trial court's orders in both appeals.

## A. FACTUAL BACKGROUND

Plaintiff David Brown desired to create a used car dealership with defendant at a site adjacent to Brown's existing business, plaintiff Stay Dry Basement Water Proofing. Defendant and an entity controlled by Brown, plaintiff DJB Rentals, Inc., purchased a building for the new endeavor and held it jointly. In January 2013, Brown acquired a dealership license for the endeavor, plaintiff Grand River Auto, and Brown and defendant sold used cars under that moniker. Defendant was in charge of Grand River Auto's day-to-day operations and possessed one of two ATM cards providing access to Grand River Auto's bank account. After several months, Brown became aware of numerous charges and overdraft fees on Grand River Auto's account that he attributed to defendant. Brown confronted defendant and decided to end their

-1-

business partnership. Brown alleged that the business records showed that thousands of dollars were missing and that defendant was the culprit.

Plaintiffs filed suit alleging misappropriation, embezzlement, fraud, and breach of fiduciary duty, and also requesting partition of the real estate jointly owned by defendant and DJB Rentals. Defendant filed a counter-complaint alleging that Brown misappropriated funds for his personal use and for the use of his company, Stay Dry. The counter-complaint additionally alleged fraud, conversion, and statutory conversion in connection with Brown's alleged financial misdeeds, while also requesting an accounting and the sale of the jointly held real estate.

Before the court held a bench trial, defendant filed a motion in limine requesting dismissal of Stay Dry as a plaintiff on grounds that the complaint stated no claim on Stay Dry's behalf. Plaintiffs opposed the motion on the grounds that that Grand River Auto operated out of Stay Dry's offices and Stay Dry provided space and office equipment. After hearing the parties' arguments, the court stated, "I don't think I have to address that if it's a nonjury trial today, right? Can't I just hear the testimony and make a decision?" Defense counsel responded "that's fine[,]" and the parties set the trial date.

On the first day of trial, defense counsel stated that he had a motion in limine, and the court inquired if it was a renewal of the previous one. Counsel affirmed that it was, and reminded the court that it had promised to consider it, which the court then did. Defendant reiterated that none of plaintiffs' claims involved Stay Dry. The court queried plaintiffs' counsel about the distinction between Brown, Grand River Auto, and Brown's company, Stay Dry and concluded that it did not see "where Stay Dry has any independent claim." The court granted the motion.

At the bench trial, Brown testified that he owned plaintiff Stay Dry, and became acquainted with defendant through a local vehicle auction. Brown and defendant desired to create an "auto mall" on the property adjacent to Stay Dry. According to Brown, he and defendant orally agreed to invest equally in the endeavor, and likewise share profits and losses. Brown stressed that they had an "equal amount" of money invested in vehicles to sell, and that they agreed to invest profits back into the business.

Brown continued that he acquired a dealership license for "Grand River Auto" around January of 2013, and Stay Dry provided office space and put all "Grand River Auto" employees on its payroll. Brown asserted that defendant was in charge of Grand River Auto's day-to-day operations, and purchased auctioned vehicles for resale as a "licensed agent under Grand River Auto." According to Brown, Grand River Auto maintained a business checking account with two debit cards. He added that "the office" of Grand River Auto had one debit card while defendant possessed the other.

Brown testified that he became aware of bank charges he attributed to defendant that totaled almost $5,000 from "overdrafts and going to the ATM." According to Brown, defendant cried when confronted with the evidence and "knew what he did." According to Brown, shortly after the confrontation he told defendant that they needed to "go through the books" to "figure out the numbers," and that they were "done." Brown testified that defendant removed some

-2-

vehicles and their titles from the business at night and told Brown to keep the remaining vehicles because they were "done." He further testified that one of his employees examined the business records and that "tens of thousands" were missing.

Juanita Patson testified that Stay Dry employed her as a human resources and database manager, adding that Brown tasked her with reconciling Grand River Auto's bank accounts and transactions after Brown and defendant ended their business relationship. Patson described the records as "a mess" because there were several sales with partial or no paperwork. She "put the pieces . . . together" to the best of her ability but acknowledged that the records were not sufficiently complete to produce an entirely accurate accounting. Patson agreed that bank statements showed that a Grand River Auto debit card was used to make purchases at Meijer, Quality Dairy, and Tommy Bahama. She further reported that there were "unusual and repetitive" cash withdrawals that she was unable to account for. Patson attempted to reconcile bank deposits with the auto sales, but she testified that there was a shortfall of $32,856.89.

Defendant testified that he personally had "between 20-25 cars" when he went into business with Brown, and they agreed that for each of his own vehicles sold, he would give $300 to Brown and $100 to the salesperson. According to defendant, he never agreed with Brown that his cars would be given to Grand River Auto, and he kept the proceeds from the sale of those cars minus the cut given to Brown and the salesman. Defendant also testified that he invested about $60,000 of his own money in Grand River Auto by purchasing auctioned vehicles that he paid for in cash. He continued that Brown was aware of this and encouraged him, adding that Brown promised to "catch up" with his own investment in the dealership later. Defendant testified that when a car he purchased at auction was sold at Grand River Auto, he, Brown, or a salesperson would deposit the proceeds into the Grand River Auto bank account. According to defendant, he and Brown each invested about $28,000 to purchase a building for the business, and they each contributed about $5,000 for repairs and renovation.

Defendant testified that on September 20, 2013, Brown told him that their business relationship was over. According to defendant, he wanted to "share" the remaining vehicles, but Brown declined and told him that Patson would calculate their joint profit or loss. Defendant stated that he checked back with Brown about Patson's progress, but Brown told him to leave the premises. Defendant asserted that he was entitled to half of the profit derived from the sale of vehicles on the lot when the business relationship ended. According to defendant, he took only one vehicle from the lot after the business relationship ended, and that vehicle was "the one [he] drive[s]." Defendant explained the shortfall in the Grand River Auto account by stressing that he was not the only person who deposited sales proceeds, and explained that only proceeds from jointly owned vehicles were deposited. He testified that he returned the Grand River Auto ATM card to Brown "around" September 20, 2013, and so the charges or withdrawals on the card after that date were not attributable to him. Defendant acknowledged using the Grand River Auto debit card to purchase gasoline and auto parts for the business. He also admitted using the card to purchase food items at Meijer and another store, but stated that he did so at Brown's request or for company purposes. He acknowledged using the card at a casino, but added that he told Brown about the charge and paid it back. Defendant denied using the card to make purchases at various other stores, but he admitted using it at fast-food restaurants while contending that he did so with Brown or with Brown's consent. He admitted using the debit card to withdraw $300 or

$400 on certain occasions, but he denied that he was responsible for withdrawals of several thousand dollars and offered that Brown also had a debit card.

The court found that the parties started their partnership by investing equal amounts of money, but defendant asserted that he invested an additional $60,000 to purchase vehicles while Brown contributed no additional cash investments. But the court considered Brown's testimony about Stay Dry's placing Grand River Auto employees on its payroll as evidence of further investment by Brown. The court concluded that, from the evidence presented, it did not "feel it's in a position to try to apportion what the investment was or should have been left at the end . . . ." The court concluded that it could not hold that defendant misappropriated funds withdrawn from ATMs because there were two debit cards, other Grand River Auto employees had access to the second card, and the exhibits did not specify "which card was used and where."

The court also found that some withdrawals at issue continued after defendant returned his debit card, and plaintiff failed to prove that defendant was responsible for the suspicious withdrawals by a preponderance of the evidence. The court addressed the discrepancy between deposits and sales, stating that it heard testimony that Grand River Auto employees other than defendant made deposits, and plaintiffs produced no direct evidence that defendant cashed checks without depositing them. The court additionally stated that it heard testimony that vehicles purchased on installment plans were listed "as the total sales price," and reasoned that the incrementally deposited installment payments would create a difference between the sales figures and the deposited funds. The court added that it could not find a breach of fiduciary duty by the preponderance of the evidence presented, and that it heard no evidence supporting plaintiffs' fraud claim. The court held that there was no cause of action in connection with any count of plaintiffs' complaint.

Regarding defendant's counter-complaint, the court stated that it was "concerned" by Brown's "mushy" testimony on the number of vehicles left on the lot at the termination of the partnership. The court was also troubled that plaintiffs created records "after the fact that . . . were . . . more favorable to them" that excluded a large check that Brown wrote to himself. The court held that defendant proved that Brown misappropriated funds because he produced five checks from Grand River Auto that Brown wrote to himself, Stay Dry, or a third party unrelated to the businesses. The court held that defendant was entitled to $5,280.41, which was half of the misappropriated funds. The court also held that defendant was entitled to half of the sales derived from vehicles left on the lot when the partnership terminated. Because defendant could only produce information about nine of the approximately 20 vehicle sales, the court awarded him half of the proceeds from those sales, which was $6,155.95. The court specified that defendant did not prove fraud, and that it would provide no findings on defendant's request for an accounting. The court ordered the jointly held real estate to be sold, subject to the court's approval.

B. ANALYSIS


I. PARTNERSHIP ACCOUNTING

Plaintiffs argue that the court erred in finding that Brown misappropriated funds and failed to pay defendant for half of the remaining inventory of Grand River Auto.

We review a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo. *Chelsea Investment Group LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). "A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and firm conviction that a mistake has been made." *Id*.

The Uniform Partnership Act[1] defines a partnership in relevant part as "an association of 2 or more persons . . . to carry on as co-owners a business for profit . . . ." MCL 449.6(1). Parties carrying on as co-owners of a business for profit thereby establish a partnership "regardless of their subjective intent to form such a legal relationship." *Byker v Mannes*, 465 Mich 637, 646; 641 NW2d 210 (2002). A partner has the right to a formal accounting of partnership affairs "[i]f he is wrongfully excluded from the partnership business or possession of its property by his copartners," or "[w]henever other circumstances render it just and reasonable." MCL 449.22. Further, "Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property." MCL 449.21(1).

Plaintiffs argue that the trial court improperly disregarded the testimony and records they produced relating to the accounting of the partnership and the reconciliation of sales records and bank deposits. This argument lacks merit. Here, the trial court did address that evidence and explained why it found it insufficient to prove plaintiffs' claims. The trial court recited that it heard testimony that Grand River Auto employees other than defendant made deposits, and noted that plaintiffs produced no direct evidence that defendant cashed checks without depositing them. Additionally, the court acknowledged testimony to the effect that vehicles purchased on installment plans were listed "as the total sales price" and that the incrementally deposited installment payments would create a difference between the sales figures and the deposited funds. The court also held that the evidence related to defendant's alleged ATM withdrawals was unconvincing because the pertinent records did not specify the ATM card was used, other employees had access to a card, and suspicious withdrawals continued after defendant returned his card. Further, plaintiffs offer no other basis for concluding that the trial court clearly erred in these factual findings, or incorrectly concluded that plaintiffs failed to carry their burden of proof in light of the problems with the evidence they offered.

Plaintiffs also fail to show that the trial court erred in concluding that Brown misappropriated funds. The trial court relied on checks defendant produced indicating that Brown wrote checks from Grand River Auto to himself, Stay Dry, and a third party unrelated to the businesses. Because defendant produced documentary evidence to support his counterclaim, and plaintiffs point to nothing in evidence to the contrary, there is no basis for concluding that the court clearly erred in this regard.

---

[1] MCL 449.1 *et seq*.

Plaintiffs further challenge the trial court's findings and conclusions on the ground that it considered documents never entered into evidence. But plaintiffs abandon this argument by failing to identify the offending documents, cite legal authority to sustain their argument, or offer any discussion concerning why the documents were not properly entered into evidence. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.")

## II. MOTION IN LIMINE

Next, plaintiffs contend that the trial court abused its discretion by granting defendant's motion in limine requesting dismissal of plaintiff Stay Dry on the ground that the complaint failed to state any claim on that plaintiff's behalf.

This Court reviews a trial court's decision to grant or deny a motion in limine for an abuse of discretion. *People v Vansickle*, 303 Mich App 111, 117; 842 NW2d 289 (2013). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Zaremba Equip Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 21; 837 NW2d 686 (2013).

Plaintiffs assert that defendant improperly brought an oral motion in limine on the day of trial because the court previously denied the motion, there was no notice or opportunity for briefing, and thus no opportunity to respond properly. But the trial court did not expressly deny defendant's previous motion; instead, it stated that it could address the issue at trial, and defense counsel agreed with that approach. Thus, plaintiffs' argument that the renewed motion was a surprise lacks merit. Likewise, the argument that there was no notice or briefing, because defendant's motion was simply a renewal of his previous motion, over which plaintiffs do not complain of any lack of notice of briefing. Further, the trial court did give plaintiffs the opportunity to respond, and plaintiffs all but conceded that there was no meaningful distinction between Brown and Stay Dry because the former controlled the latter. Moreover, plaintiffs do not argue that the trial court substantively erred by dismissing Stay Dry. Accordingly, plaintiffs have failed to show that the court abused its discretion by hearing the renewed motion and then dismissing Stay Dry from the action.

Plaintiffs also argue that defendant's motion was mislabeled because it requested dismissal of a party, on the ground that motions in limine generally address the admissibility of evidence or subject matter the parties might bring to the jury's attention. See *Lapasinskas v Quick*, 17 Mich App 733, 737 n 1; 170 NW2d 733 (1969). However, courts are not bound by the labels parties attach to their actions because they would otherwise be elevating form over substance. See *Johnston v Livonia*, 177 Mich App 200, 208; 441 NW2d 41 (1989). Plaintiffs are not entitled to relief on this issue.

## III. ADJOURNMENT

Next, plaintiffs assert that their due-process rights were denied, and that the trial court otherwise abused its discretion, by denying a motion to adjourn an evidentiary hearing

concerning defendant's request that the court reduce the purchase price of the jointly held real property on the ground that plaintiff left debris in the building.

We review a trial court's decision on a motion to adjourn for an abuse of discretion. *In re Jackson*, 199 Mich App 22, 28; 501 NW2d 182 (1993); *Tisbury v Armstrong*, 194 Mich App 19, 20; 486 NW2d 51 (1991).

"A motion for adjournment must be based on good cause, and a court, in its discretion, may grant an adjournment to promote the cause of justice." *Zerillo v Dyksterhouse*, 191 Mich App 228, 230; 477 NW 2d 117 (1991). "[I]n order for a trial court to find good cause for an adjournment, a legally sufficient or substantial reason must first be shown." *In re Utrera*, 281 Mich App 1, 10-11; 761 NW2d 253 (2008) (internal quotation marks and citation omitted). Under MCR 2.503(C)(2), "An adjournment may be granted on the ground of unavailability of a witness or evidence only if the court finds that the evidence is material and that diligent efforts have been made to produce the witness or evidence." Factors warranting denial of the motion include the granting of prior adjournments, the failure of the moving party to exercise due diligence, and the lack of any injustice from denial of the motion. *Tisbury*, 194 Mich App at 20.

In the instant case, the trial court held a post-judgment hearing at which it approved the sale of the parties' jointly-held real estate to defendant and placed the terms of the sale on the record. Defendant submitted a proposed order, but plaintiffs objected that it did not comport with the trial court's ruling in part because it did not state that the property was to be sold "as is." Defendant responded that plaintiffs discarded trash in the building, and defendant would require three dumpsters and around 40 hours of labor to remove the debris. Defendant requested that the court reduce the sales price of the building by $3,550 to compensate for the cost of debris removal, as well as rent proceeds retained by plaintiffs.

The court stated that defendant's allegation that plaintiffs stored garbage and debris in the building was "sort of like a change in circumstances," and that it did not believe the building could be sold as-is without defendant's having to pay to clean it up. Plaintiffs disagreed, asserting that the debris was already in the building while both parties jointly owned it, and that defendant's claim "would require an evidentiary hearing." The court replied, "I'm ready. I'm giving you until November 24th, 2:00, to come back for an evidentiary hearing." Plaintiff's attorney appeared to acknowledge the court's offer of an evidentiary hearing, stating "[w]ith respect to this, we will have a subsequent hearing with regards to the condition of the property." The court addressed other issues with the proposed order, but stated it would "strike the as-is provision" because "[w]e still need to decide who is going to clean up the place."

Thereafter, defendant filed a brief requesting, in part, that the court award him $5,000 to pay for the cleanup of the property. Plaintiffs filed a motion to adjourn, asserting that they believed the previous hearing resolved all issues, and defendant did not file a motion or provide sufficient notice of the evidentiary hearing. Plaintiffs asserted that they received insufficient notice via an e-mail sent by defense counsel the day before the hearing. Plaintiffs alleged that they discovered the identity of individuals who may have left vehicles in the building, and that they would be prejudiced for lack of time to locate and subpoena the responsible persons. The trial court did not expressly rule on plaintiffs' motion to adjourn, but it denied it by implication by continuing and addressing other matters. The court credited defendant's testimony and

photographic evidence in holding that the debris and vehicles were placed on the property "under Mr. Brown's watch." The court further held that plaintiffs' contention that a third party parked a vehicle in the building and deposited trash there was not plausible. The court awarded defendant $2,200, which was the amount requested for dumpster rental and labor to clean out the building.

The trial court did not abuse its discretion by denying the motion to adjourn. Plaintiffs assert that their due process rights were violated because they lacked notice of the evidentiary hearing and they believed the previous hearing resolved all outstanding issues. "Due process in civil cases generally requires notice of the nature of the proceedings, an opportunity to be heard in a meaningful time and manner, and an impartial decision maker." *Cummings v Wayne Co*, 210 Mich App 249, 253; 533 NW2d 13 (1995). However, at the November 16 hearing, plaintiffs' counsel himself suggested that an evidentiary hearing was required, and the trial court replied, "I'm ready. I'm giving you until November 24th, 2:00, to come back for an evidentiary hearing." While counsel expressed doubt that the court still had jurisdiction to hold a hearing, the court satisfied itself that it retained jurisdiction and plaintiffs' counsel later stated, "[w]ith respect to this, we will have a subsequent hearing with regards to the condition of the property." Thus, counsel had notice of the hearing from the court itself. Plaintiffs' counsel correctly reports that he received an e-mail from defense counsel notifying him about the hearing, but plaintiffs misconstrue the nature of the e-mail as one intended to provide them with notice in the first instance. Instead, defense counsel's e-mail reasonably presumed that plaintiffs were aware of the hearing and merely informed them that counsel learned that the court scheduled the hearing a half-hour earlier than it had indicated at the previous hearing.

Additionally, plaintiffs' contention that they believed the November 16 hearing resolved all disputes lacks merit because the court stated that it still had to decide who would clean up the property, which statement plaintiffs' counsel acknowledged on the record. Plaintiffs also assert, as they did in the trial court, that they did not receive defendant's brief on damages. But the record contains a proof of service filed on November 23, 2015, the day before the hearing. In short, plaintiffs have failed to establish a violation of due process.

Plaintiffs also assert that the trial court abused its discretion on the ground that they needed more time to locate and subpoena individuals whom they believed were responsible for placing the trash and vehicle(s) in the building. But the trial court opined both that it was skeptical that third parties could place the debris in the building without Brown's knowledge, given his diligence in all other aspects of his business, and that Brown was responsible regardless, because the trash was deposited under his watch while he restricted defendant from being on the premises. Accordingly, if plaintiffs had been allowed the opportunity to bring witnesses who would have admitted responsibility for the debris at issue, that might have affected the court's doubts concerning the role of such third parties in the matter, but not the court's conclusion that plaintiff Brown was responsible even so. In short, the court did not abuse its discretion in denying the motion to adjourn.[2] *Jackson*, 190 Mich App at 28.

---

[2] Defendant argues that plaintiffs' argument concerning the adjournment was frivolous and that sanctions are warranted. However, a request for sanctions for filing a vexatious appeal is

## IV. JUDICIAL BIAS

Finally, plaintiffs contend that the judge breached the veil of judicial impartiality during the evidentiary hearing. Claims that judicial misconduct denied a party a fair trial are reviewed de novo. *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

A trial judge must act as a neutral and detached judicial officer. See *Cain v Dep't of Corrections*, 451 Mich 470, 509; 548 NW2d 210 (1996). "A trial judge is presumed to be impartial and the party who asserts partiality has a heavy burden of overcoming that presumption." *In re MKK*, 286 Mich App 546, 566; 781 NW2d 132 (2009).

Plaintiffs first argue that the trial judge demonstrated a lack of impartiality because he denied the motion to adjourn. But this argument lacks merit because, as discussed above, the court did not abuse its discretion by denying the motion. Further, "rulings against a litigant, no matter how erroneous, and how vigorously and consistently expressed, are not disqualifying." *Wayne Co Prosecutor v Parole Bd*, 210 Mich App 148, 154; 532 NW2d 899 (1995) (internal quotation marks and citation omitted).

Next, plaintiffs assert that the trial judge improperly expressed hostility toward plaintiff Brown. The judge did state that Brown was testing the court's patience, and that the case should have concluded months earlier. But "[j]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases do not generally support a challenge for partiality." *People v McIntire*, 232 Mich App 71, 104-105; 591 NW2d 231 (1998), rev'd on other grounds 461 Mich 147; 599 NW2d 102 (1999). "Moreover, partiality is not established by expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women sometimes display." *Id*. The challenged judicial conduct in this instance was the mere expression of impatience and dissatisfaction that does not suffice to indicate a lack of impartiality.

Next, plaintiffs contend that the judge demonstrated partiality by conducting direct examination of defendant, and by coaching defendant to testify in ways that overcame plaintiffs' objections. Indeed, the Judge called defendant to the stand and conducted a brief examination over defendant's photographic exhibits before admitting them. Plaintiffs assert that such judicial questioning was inappropriate. But "when evaluating a judge's questioning of witnesses, a reviewing court must first bear in mind that such interrogation is generally appropriate under MRE 614(b)." *Stevens*, 498 Mich at 173. The goal of judicial questioning is to "produce fuller and more exact testimony or elicit additional relevant information." *Id*. In this instance, the judge questioned defendant before turning over the questioning to defense counsel, which timing suggests that the judge was not eliciting *additional* information or *clarifying* an earlier point. Although it would have been more appropriate for the judge to allow defense counsel to perform the initial examination, the judge having questioned the witness first does not itself establish bias or prejudice.

---

governed by MCR 7.216(C)(1) and should be raised in a motion as opposed to an appeal brief. MCR 7.211(C)(8). Moreover, our conclusion that plaintiffs' argument lacked merit did not render the argument frivolous.

When the judge turned over questioning to defense counsel, plaintiff objected to two questions that called for speculation, and the judge directed defendant to testify in a way that overcame the objections without ruling on them. In particular, the judge recast counsel's questions so that defendant's answers would be based on personal experience rather than speculation. This did not amount to bias or prejudice. The court merely rephrased the questions so that defendant would conform to the rules of evidence. In short, the court's intervention in the questioning of defendant did not reveal bias or otherwise unfairly disadvantage plaintiffs.

Plaintiffs also assert that the trial judge showed bias because it did not take any testimony from plaintiff. However, it is apparent from the record that Brown was not personally present at the hearing in question. Furthermore, plaintiffs' counsel made clear that he was satisfied that the court accept his "offers of proof" that Brown would deny placing debris in the building, and the court stated that it would accept that Brown would so testify, then held even so that Brown knew or should have known about the debris. Because the court indicated that it would accept at face value plaintiffs' counsel's representations of how Brown would testify, the lack of actual testimony on Brown's part did not disadvantage plaintiffs. Plaintiffs have failed to show judicial bias.

Affirmed. Having prevailed in full, appellee may tax costs. MCR 7.219(A).


/s/ Jane M. Beckering
/s/ Peter D. O'Connell
/s/ Stephen L. Borrello